NO. 22-4072 (L)

IN THE UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,                    :
                              Appellee  :

               v.                              :

JORGE SANCHEZ-GARCIA,                       :        No. 22-4072(L)

VINCENTE BANALES RODRIGUEZ,         :        No. 22-4075

NICOLAS MORALES-GUTIERREZ,           :        No. 22-4077

JESUS BENITEZ PINEDA,                         :        No. 22-4078

HECTOR TAPIA HERNANDEZ-AVILA,      :        No. 22-4100

MARTIN MALACARA-GUERRERO,           :        No. 22-4107

                        Appellants :

On Appeal from the United States District Court

For the Middle District of North Carolina

**CORRECTED CONSOLIDATED BRIEF OF APPELLANTS**

LOUIS C. ALLEN
Federal Public Defender
ERIC D. PLACKE
First Assistant Federal Public Defender
MIREILLE P. CLOUGH
Assistant Federal Public Defender
301 North Elm Street, Suite 410
Greensboro, NC 27401
(336) 333-5455
Attorneys for Appellants

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................ i

TABLE OF AUTHORITIES ................................................ ii

    CASES ...................................................................... ii-iv

    STATUTES .................................................................. iv

    RULES........................................................................ iv

    MISCELLANEOUS ...................................................... v

JURISDICTIONAL STATEMENT ...................................... 1

STATEMENT OF THE ISSUE ............................................ 2

STATEMENT OF THE CASE .............................................. 3

SUMMARY OF THE ARGUMENT ...................................... 21

ARGUMENT ...................................................................... 24

    I.  Standard of Review .................................................. 24

    II. Argument ................................................................ 24

CONCLUSION .................................................................. 40

REQUEST FOR ORAL ARGUMENT

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Pac. Coast S.S. Co.*, 225 U.S. 187 (1912) .................... 32, 39

*Bear Lake & River Waterworks & Irrigation. Co. v. Garlans,* 164 U.S. 1
(1896) ..................................................................... 38, 39

*Fourco Glass Co. v. Transmirra Prods. Corp.*, 353 U.S. 222 (1957)..32, 39

*Harness v. Watson*, 47 F.4th 296 (5th Cir. 2020) ................................. 30

*Hunter v. Underwood*, 471 U.S. 222 (1985) .......................................... 25

*Keene Corp. v. United States*, 508 U.S. 200 (1993) ......................... 32, 39

*La Union del Pueblo Entero v. Ross,* 353 F. Supp. 3d 381 (D. Md 2018)
..................................................................................... 37

*Loving v. Virginia*, 388 U.S. 1 (1967) ................................................. 24

*N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204 (4th Cir. 2016) ..34

*Oneida County v. Oneida Indian Nation of New York State,* 470 U.S. 226
(1985) ..................................................................... 38, 39

*United States v. Barcenas-Rumualdo*, ___ F.4th ___, 2022 WL 17072285
(5th Cir. Nov. 18, 2022) ............................................... 30

*United States v. Barrera-Vasquez,* ___ F. Supp. 3d ___, 2022 WL 3006773
(E. D. Va. July 28, 2022) ............................................... 28

*United States v. Buculei,* 262 F.3d 322 (4th Cir. 2001) ......................... 24

*United States v. Calvillo-Diaz*, 2022 WL 1607525 (N. D. Ill. May 20, 2022)
..................................................................................... 28

*United States v. Carrillo-Lopez,* 555 F. Supp. 3d 996 (D. Nev. 2021)
.................................................................... 26-28, 31, 34-36, 39, 40

*United States v. Crespo-Castelan*, 2022 WL 2237574 (S.D.N.Y. June 22, 2022) ................................................................ 28, 29

*United States v. Gibert*, 677 F.3d 613 (4th Cir. 2012) ......................... 24

*United States v. Hernandez-Lopez*, 583 F. Supp. 3d 815 (S. D. Texas 2022) .................................................................. 27-29

*United States v. Machic-Xiap*, 552 F. Supp. 3d 1055 (D. Or. 2021)..28, 29

*United States v. Maldonado-Guzman*, 2022 WL 2704036 (S.D.N.Y. July 12, 2022)... ....................................................... 29

*United States v. Munoz-De La O,* 586 F. Supp. 3d 1032 (E.D. Wash. 2022) .................................................................... 27, 28

*United States v. Novondo-Ceballos,* 554 F. Supp. 3d 1114 (D. N. Mex. 2021) .................................................................... 29

*United States v. Paredes-Medina,* 2022 WL 7683738 (D. Nev. Oct. 13, 2022) .................................................................... 29

*United States v. Ponce Calvan,* 2022 WL 484990 (S. D. Cal. Feb. 16, 2022) .................................................................... 29

*United States v. Ramirez-Aleman,* 2022 WL 1271139 (S. D. Cal. Apr. 27, 2022) .................................................................... 29

*United States v. Rodriguez-Arevalo,* ___ F. Supp. 3d ___, 2022 WL 1542151 (M. D. Pa. May 16, 2022) .............................................. 29

*United States v. Ryder,* 110 U.S. 729 (1884) ................................... 32, 39

iii

*United States v. Sanchez-Felix,* 2021 WL 6125407 (D. Col. Dec. 28, 2021) ..............................................................................29

*United States v. Santos-Reynoso,* 2022 WL 2274470 (S.D.N.Y. June 23, 2022) ...........................................................29

*United States v. Vera,* 2022 WL 3716503 (D. N. H. Aug. 29, 2022) ......29

*United States v. Viveros-Chavez,* 2022 WL 2116598 (N. D. Il. June 13, 2022) ...........................................................29

*United States v. Wence*, 2021 WL 2463567 (D. Virgin Islands Jun. 16, 2021) ...........................................................29

*Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252 (1977) .............................................. 2, 17, 18, 21-28, 37, 39, 40

*Wong Wing v. United States*, 163 U.S. 228, 16 S.Ct. 977, 41 L.Ed. 140 (1896) ...........................................................26, 27

*Yick Wo v. Hopkins*, 118 U.S. 356 (1886) ...............................................24

## Statutes

8 U.S.C. § 1326 ............................ 2-5, 14, 16, 21-29, 32, 33, 37, 39, 40-41

18 U.S.C. § 3231 ...........................................................................1

28 U.S.C. § 1291 ...........................................................................1

## Rules

FED. R. APP. P. 4(b) ...................................................................1

FED. R. APP. P. 11(a)(2) ...........................................................18

iv

**Miscellaneous**

U.S. Constitution, Amend. V  ......................2, 3, 21, 22, 24, 25, 27, 28, 41

United Statutes at Large, 82 Cong. Ch. 108, 66 Stat. 26 (March 20, 1952)

..................................................................................................35

# JURISDICTIONAL STATEMENT

This is a direct appeal by the Defendants of their federal criminal convictions. Jurisdiction was conferred on the United States District Court for the Middle District of North Carolina by 18 U.S.C. § 3231. Appellate jurisdiction is conferred on this Court by 28 U.S.C. § 1291. Jorge Sanchez-Garcia filed notice of appeal February 4, 2022, from final judgment entered February 2, 2022. Vincente Banales Rodriguez filed notice of appeal February 4, 2022, from final judgment entered February 2, 2022. Nicolas Morales-Gutierrez filed notice of appeal February 8, 2022, from final judgment entered February 2, 2022. Jesus Benitez Pineda filed notice of appeal February 8, 2022, from final judgment entered February 2, 2022. Hector Tapia Hernandez-Avila filed notice of appeal February 15, 2022, from final judgment entered February 2, 2022. Martin Malacara-Guerrero filed notice of appeal February 18, 2022, from final judgment entered February 17, 2022. FED. R. APP. P. 4(b).

## STATEMENT OF THE ISSUE

Whether, under *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252 (1977), 8 U.S.C. § 1326 violates the Equal Protection Clause of the Fifth Amendment to the United States Constitution based on the discriminatory intent of the law and its disparate impact on Mexican and other Latinx immigrants.

## STATEMENT OF THE CASE

Defendants Jorge Sanchez-Garcia, Vincente Banales Rodriguez, Nicolas Morales-Gutierrez, Jesus Benitez Pineda, Hector Tapia Hernandez-Avila, and Martin Malacara-Guerrero were each indicted in the Middle District of North Carolina on one count of unlawful reentry by a previously deported alien, in violation of 8 U.S.C. § 1326. J.A. 0008, J.A. 1063, J.A. 1099, J.A. 1150, J.A. 1184, J.A. 1226. Each moved to dismiss the indictment on the ground that 8 U.S.C. § 1326 violates the Equal Protection Clause of the Fifth Amendment, and the District Court granted Defendants' request to consolidate their cases for purposes of hearing the motion to dismiss. J.A. 0016.

In support of their motion to dismiss (J.A. 0017), the Defendants filed a brief with 15 exhibits. J.A. 0126-0419, J.A. 0420-0876. After the Government filed a response in opposition (J.A. 0024), the Defendants filed a reply with three additional exhibits. J.A. 0051-0109. On October 18, 2021, the District Court heard testimony from the Defendants' expert, (J.A. 0882-0988) and admitted in evidence all the exhibits previously filed by the Defendants. J.A. 0988-0989.

- 3 -

The Defendants' Exhibits included a declaration from Dr. Kelly Lytle Hernandez, Professor of History, African American Studies, and Urban Planning at UCLA, regarding the history of 8 U.S.C. § 1326, with this overview.

> In 1929, the U.S. Congress first criminalized the act of entering the United States without authorization, making entering the United States without authorization a misdemeanor and re-entering the United States without authorization after deportation a felony. Although no racial group was named in the 1929 legislation, racial animus motivated the bill's author. Moreover, the politics of white supremacy dominated the politics of immigration control at the time. On these grounds, the individual racial animus of the original bill's author and the prevailing politics of immigration legislation leading into and during the 1920s, the criminalization of unauthorized entry was a racially motivated act. Unsurprisingly, the new law delivered racially disparate outcomes.

J.A. 0463. The Defendant's Exhibits also included a transcript of prior testimony by Dr. Hernandez and Dr. Benjamin Gonzalez O'Brien, Associate Professor of Political Science at San Diego State University, regarding the history of Section 1326, and contemporaneous records regarding the original criminalization of unlawful reentry in 1929, and its recodification as 8 U.S.C. § 1326 in 1952. At the hearing on October 18, 2021, the Defendants called Dr. Gonzalez O'Brien, whom the District

- 4 -

Court accepted, without Government objection, "as an expert in political science with a specific expertise in immigration policy, race, and public policy, with particular emphasis on past policy choices and future policymaking in Congress." J.A. 0885.

Professor Gonzalez O'Brien traced the development of United States immigration law and policy in the decades leading up to the original criminalization of unlawful reentry in 1929, and its recodification as 8 U.S.C. § 1326 in 1952. He began with the report issued by the Dillingham Commission in 1911, which he described as "the first ... comprehensive examination of U.S. immigration policy." J.A. 0886. While Professor Gonzalez O'Brien explained the Dillingham Commission report did not focus on Mexican immigration, he also highlighted what it did say: "The Mexican immigrants are providing a fairly acceptable supply of labor. While the Mexicans are not easily assimilated, this is of not very great importance *as long as most of them return to their native land after a short time.*" J.A. 0886-0887 (emphasis added). Dr. Gonzalez O'Brien testified about the impact eugenics and, in particular "Harry Laughlin, the head of the Eugenics Record Office," had in Congress and on U.S. immigration law and policy in the 1920s. J.A. 0887. He explained

that the National Origins Act of 1924 was the first permanent implementation of national immigration quotas, "and those quotas were specifically meant to privilege Northern and Western European immigration." J.A. 0891. Discussing the desire by some in Congress to include restrictive quotas on Mexican and other Western Hemisphere immigrants like the restrictive quotas on immigrants from Southern and Eastern Europe, he quoted Congressman Patrick O'Sullivan of Connecticut, "I do not know what standard is used to measure desirability, but I do know that the average Italian is as much superior to the average Mexican as a full-blooded Airedale is to a *mongrel*." J.A. 0892 (emphasis added).

Regarding the criminalization of unlawful entry and unlawful reentry after deportation as part of the Undesirable Aliens Act of 1929, Dr. Gonzalez O'Brien explained the tension between those who considered Latinx people in general, and Mexicans in particular, to be racially inferior, and wanted to extend quotas to them, and "agricultural interests [who] argued … that Mexican immigration was necessary; otherwise, they would have to import Black labor instead." J.A. 0896. Notably, the racial animus extended to people from "any country south of

the Rio Grande," who Congressman Robert Green described as having a "mixture of blood of white, Indian, and Negro" and which he believed imposed "a very great penalty upon the society which assimilates it." J.A. 0896 (internal quotation marks omitted). That tension was resolved by a compromise – no Western Hemisphere immigration quotas and, instead, a robust system of deportation enforced by criminal penalties for unlawful entry and reentry. The compromise was acceptable to eugenicists such as Harry Laughlin who, as Professor Gonzalez O'Brien testified, said in 1928 that "deportation is the last line of defense against a contamination of American family stock by *alien heredity degeneracy*," and acceptable to agribusiness which, "in congressional hearings [said] that deportation also allows for control of Mexican immigration, that essentially there is a prevention of these individuals from settling long term in the United States." J.A. 0898 (emphasis added).

The compromise became law in 1929 with passage of the Undesirable Aliens Act. Professor Gonzalez O'Brien described how the Act was "introduced by [Senator] Coleman Livingston Blease … a known and outspoken white supremacist," who was a member of the Senate Immigration and Naturalization Committee. J.A. 0902. He explained

- 7 -

that "[a]t the time that the Undesirable Aliens Act was passed, the chairman of the Immigration and Naturalization Committee in the House [was] Albert Johnson, who was also a known eugenicist." J.A. 0902. The legislation they shepherded through Congress included, for the first time in the United States, criminal penalties for unlawful reentry, a provision "seen as needed … as a way – both trying to deter undocumented entry, but also a means of controlling the Mexican population once they're in the United States." J.A. 0905. The relevant portion of the legislation, enacted March 4, 1929, made it a felony, punishable by up to two years in prison and a $1000.00 fine, for a previously deported alien to "enter[ ] or attempt[ ] to enter the United States." J.A. 0649.

Professor Gonzalez O'Brien also testified about the "Mexican repatriation" of 1929 through 1936, during which an estimated "20 percent of the Mexican population return[ed] to Mexico," often under the threat of forced removal, and that many United States citizens were also swept up in the process. J.A. 0911. He described the different treatment of Canadian immigrants, a group described in 1927 by the Immigration Restriction League as "of racial origins similar to our own." J.A. 0914.

- 8 -

That included the 1935 adoption of a policy that "only applied to the northern border" and that "essentially allowed undocumented Canadian immigrants to be approved for entry while they were residing in the United States illegally," a benefit not available as a practical matter to most Mexican and other Latinx immigrants. J.A. 0914. Dr. Gonzalez O'Brien explained that, while originally available to anyone who could make their way to Canada and then enter across our northern border, "the intent of this [policy] is made very clear in 1945 … when Mexicans were explicitly excluded from those who could apply for this program of pre-examination. J.A. 0915. Notably, the program only "end[ed] entirely in 1961." J.A. 0915.

Professor Gonzalez O'Brien described the "Bracero Program" which was "first created under the Mexican Farm Labor Program [A]greement of 1942, … [and] then extended in 1951 with the Migrant Labor Agreement [A]ct" J.A. 0915-0916. He explained that the program provided needed Mexican labor, while "also … guaranteeing impermanence." J.A. 0916. "Braceros," as the workers were known, "could work for six months, but then they had to go back to Mexico" before applying again for the program. J.A. 0916. Dr. Gonzalez O'Brien

explained the connection between the limits of the Bracero Program, and

what was referred to at the time as the "wetback problem." J.A. 0919.

> [T]he term "wetback" becomes popularized in … the 1940s and particularly is used with a fair amount of regularity by members of government, as well as nicknames for legislation and immigration enforcement programs across the 1950s.
>
> . . .
>
> [T]he wetback problem, as discussed in Congress and by a number of academic writers across the period of the 1950s, is also in part born of the Bracero Program itself. The Bracero Program would really create this kind of two tracks for Mexican immigrants. There were the *braceros,* and there were the wetbacks.
>
> The *braceros* were the legal entrants of the United States who came in under this program, who were seen as kind of the disposable labor force. The wetbacks were the people who entered illegally, were performing similar functions to *braceros.* They were being used for their labor but were also being driven in part by the fact that the Bracero Program itself didn't have enough spots to meet the demand for labor in the United States. In other words, there was a demand for a larger labor force than the Bracero Program could bring in.
>
> In addition to that, a lot of employers, especially in border regions, preferred undocumented labor because it involved less red tape for them. They didn't have to provide the kind of minimum wage that was associated with the Bracero Program or any of those additional provisions, and they had a much more -- with undocumented immigrants, they had a much more controllable labor force. Those individuals, because of their status, were less likely to report workplace

- 10 -

violations or unsafe conditions or sexual harassment or anything – or anything else.

*But the term itself would come to be associated with a lot of the same eugenical thinking that we would see in the discussion of Mexican immigration in the 1920s: This idea that -- that the wetback was someone who was prone to criminal behavior, that they were someone who was -- that they were prone to illness, that they were in some way biologically inferior.*

J.A. 0918-0920 (emphasis added). Professor Gonzalez O'Brien explained that the "anti-harboring" legislation Congress passed on March 20, 1952, was popularly referred to as the "Wetback Bill." J.A. 0923. For example, in an April 16, 1952, report on recently enacted bills, the Senate Judiciary Committee lists the title of S. 1851 as "Preventing illegal entry of aliens (*wetbacks*)." J.A. 0254 (emphasis added). Dr. Gonzalez O'Brien pointed out that the legislation included a "carve-out, though, for employers" which shielded them from criminal liability, and explained "this is part of the history of Mexican immigration in this country, where employers are allowed access to labor and what is seen as a disposable labor force, and the responsibility for the act of undocumented entry is placed on the immigrant themselves and is not really shared by the employer in any way." J.A. 0924-0925.

- 11 -

The same Congress that passed the "Wetback Bill" also passed the "McCarran-Walter Act of 1952." J.A. 0926. As Dr. Gonzalez O'Brien testified and as seen in Defendants' Exhibit O, use of the racial slur "wetback" was also part of the discussion of the McCarran-Walter Act in both houses of Congress. J.A. 0126-0419. Senators Humphrey, McCarran, and Morse all made use of the term, as did Congressman Walter. J.A. 0134, J.A. 0143, J.A. 0164, J.A. 0245, J.A. 0247, J.A. 0248, J.A. 0249, J.A. 0399. Speaking in opposition to Senator McCarren's suggestion that the new legislation include a provision that would eliminate the requirement that a person act "willfully and knowingly" in order to violate the recently enacted alien harboring provision of the "Wetback Bill," Senator Humphrey used the term repeatedly: "Senators are aware of my own deep interest in the *wetback* provisions of our immigration laws. We debated the *wetback* problem day in and day our earlier in the session. Some time ago I joined the distinguished Senator from Illinois in an effort to tighten the *wetback* provisions." J.A. 0247 (emphasis added). Similarly, Deputy Attorney General Peyton Ford's May 14, 1951, letter to Senator McCarran regarding the Department of Justice review of his draft bill quotes a March 26, 1951, report from the

President's Commission on Migratory Labor that also uses the term "wetback." J.A. 0091.

Professor Gonzalez O'Brien testified that, while the McCarran-Walter Act "allowed Asian immigrants to come to the United States and to naturalize for the first time, … [i]t preserved national quotas, … [and] continued privileging … Northern and Western European immigration, although not to the same extent." J.A. 0927. After quoting Congressman John Wood's statement during debate on the McCarran-Walter Act that he believed "statistics would show that the Western European races have made the best citizens in America," Dr. Gonzalez O'Brien explained that "while the language has shifted a little and these directly eugenical statements are [generally] no longer made, *we still see in McCarran-Walter a bill that is meant to preserve the racial integrity of the United States.*" J.A. 0927 (emphasis added).

Professor Gonzalez O'Brien explained that the McCarran-Walter Act codified the statute at issue in this case, 8 U.S.C. § 1326, with "relatively minimal" change from the original 1929 criminalization of unlawful reentry. J.A. 0931. The only significant change was "the 'found in' language that was added into the bill," a change suggested by Deputy

Attorney General Ford to make establishing venue easier in illegal reentry prosecutions. J.A. 0931. Dr. Gonzalez O'Brien also discussed the debate about Section 1326.

> There was no substantial debate around -- or no debate really around 1326 under the 1952 McCarran-Walter Act. After reading -- I've read through the *Congressional Record*. I have not found any instances that specifically referenced or in any way, shape, or form debate 1326 in the McCarran -- in the debate around the McCarran-Walter Act.

J.A. 0933.

Professor Gonzalez O'Brien testified that in his opinion 8 U.S.C. § 1326 has had a disparate impact on Latino individuals in the United States, and that it was motivated by racial animus. J.A. 0981-0983.

> I do believe it was motivated by racial animus. I think this is reflected in the eugenesis [sic] language that was used in the congressional debate around the Undesirable Aliens Act; and I think this is further reflected in 1952 by the language used to describe the, quote/unquote, wetback population, which -- while it represented a shift in language from 1929 where they were talking about Mexicans broadly as a group, this was because by the period of the 1950s the explicitly eugenesis [sic] language that was used in 1929 was no longer seen as socially acceptable considering the horrors of the World War and the Holocaust. So the language changes, but if we look at the content and the ascribed characteristics that are made to wetbacks in 1952 or to Mexican immigrants in 1929, those – the content of those stereotypes is very -- is very similar.

J.A. 0983. He also testified that Congress has never examined the "racist origins of either the 1929 law or the 1952 law." J.A. 0984.

On cross examination, Professor Gonzalez O'Brien testified that the "next significant piece of … immigration legislation after 1952 … [was the] … Hart-Celler Act [of 1965, also] … called the Immigration and Nationality Act," which ended the system of national origin quotas. J.A. 0962. Next was "the 1986 Immigration Reform and Control Act, [which the witness described as] the first attempt … to … comprehensively address the issue of undocumented immigration" and which granted amnesty to two to three million undocumented Mexican immigrants. J.A. 0969. Still on cross examination, Professor Gonzalez O'Brien also described the 1988 addition of subsection (b) to Section 1326, which provided increased penalties for unlawful reentry by aliens with certain prior convictions, and the 1996 Illegal Immigration Reform and Immigrant Responsibility Act, which also amended the penalties for unlawful reentry by aliens with various prior convictions. J.A. 0970-0971. When Government counsel asked whether there was "ever really a danger that 1326 was ever going to be repealed," Dr. Gonzalez O'Brien said, "Well, *1326 has never really been subjected either to significant*

- 15 -

*congressional debate*, nor has its deterrent effect actually been subjected to any examination ….” J.A. 0980-0981 (emphasis added).

The Government did not call any witnesses, nor did it present any other evidence. J.A. 0989.

After hearing argument from counsel, the District Court denied the motion to dismiss.

> Well, I don't know. I find it kind of hard to get my hands around this because there are the – you know, you do have overlapping constitutional considerations here. Yeah, you've got the Equal Protection Clause, but you also have, I think, a pretty strongly based deference to other branches of government about immigration matters just based on the separation of powers. And it's, I think, beyond dispute that folks who are not citizens have -- are entitled to equal protection of the law. I think that that's beyond dispute.

> But exactly what that means in this context, where immigration-related statutes are an exercise in discrimination -- I mean, that's what they are. They discriminate between people who are here -- who are citizens and people who are not. And, you know, exactly what does that mean? And when you add to it the deference people usually give to Congress -- courts always give to Congress in enacting criminal statutes, it's a little hard to figure out if the Supreme Court actually would apply *Arlington Heights* in this situation. I don't know if they would or not, but on its face, it seems like it could be applied and -- if -- if the proof were such to meet that standard.

- 16 -

And, you know, I'm kind of willing to give you 1929 in terms of some underlying racist motivations being one of the factors there; but, you know, when you get much past that, I think it's a much dicier proposition. And historical context under *Arlington Heights*, I don't think I really buy the idea that it's just what happened when it was enacted when you have a situation where it was reenacted in 1952, much weaker evidence of racism towards Mexicans or Hispanics or Latinx, however you want to phrase the group that we're talking about here, you know, an antiracist component to it in terms of Asian Americans, and no quotas imposed for people in the Western Hemisphere. So it just seems much, much weaker.

And then you have repeated congressional reenactments well into the modern era, which demonstrate a continued commitment to the deterrent effect of criminal punishment for this kind of conduct and -- and to the protection of the public as – which I think you see with the -- you know, well, if you keep coming back, the only way to protect the public is -- or you come back after you've committed crimes, then we have to protect the public by separating you; and if we can't separate you by removing you, we will separate you by incarceration. And, you know, those are legitimate policy decisions.

So it's pretty tough for me to -- to say that when I look at the entire historical context that the Act, you know, before me now continues to be motivated by racial animus. I don't think I can find that. I do not find that. And, you know, whether it was or wasn't in 1929 -- you know, yeah, it probably was a motivating factor of many folks in Congress, but that -- that doesn't seem to be the end of the inquiry to me.

So I'm having a little trouble figuring out exactly how I would exactly state this test, but if there -- if the rational basis test applies, it passes. There's a rational basis for

- 17 -

this statute based on public safety and deterrence and control of the borders, if nothing else.

If it -- even if *Arlington Heights* applies and even if one assumes racial animus in 1929, I'm not satisfied that it continues -- that it continued into 1952 and beyond. The evidence past 1929 seems to indicate to me that the racial animus -- I don't know that it dissolved or completely went away, but other factors overcame it, and there's been plenty of evidence about that in terms of economic factors, the labor market factors, national security factors, et cetera. So I'm going to deny the defendants' motion, subject, obviously, to reconsideration if the Fourth Circuit tells me otherwise before -- before sentencing.

J.A. 1041-1044. Thereafter, each Defendant entered a conditional plea of guilty pursuant to Fed. R. Crim. P. 11(a)(2). J.A. 0116, J.A. 1071, J.A. 1123, J.A. 1158, J.A. 1199, J.A. 1236.

The District Court sentenced Sanchez-Garcia to six months of imprisonment, consecutive to any state sentence up to 13 months and concurrent thereafter, one year of supervised release, and waived the special assessment. J.A. 1047. Written judgment was entered February 2, 2022. J.A. 1047. The Defendant filed a timely notice appeal on February 4, 2022. J.A. 1054.

The District Court sentenced Vincente Banales Rodriguez to 36 months of imprisonment, consecutive to his state sentence, three years of

supervised release, and a $100 special assessment. J.A. 1081. Written judgment was entered February 2, 2022. J.A. 1081. The Defendant filed a timely notice of appeal on February 4, 2022. J.A. 1088.

The District Court sentenced Nicolas Morales-Gutierrez to 37 months of imprisonment, 12 months concurrent with his state sentence and 25 months consecutive, three years of supervised release, and a $100 special assessment. J.A. 1133. Written judgment was entered February 2, 2022. J.A. 1133. The Defendant filed a timely notice of appeal on February 8, 2022. J.A. 1140.

The District Court sentenced Jesus Benitez-Pineda to 15 months of imprisonment, concurrent with any state sentence, three years of supervised release, and waived the special assessment. J.A. 1167. Written judgment was entered February 2, 2022. J.A. 1167. The Defendant filed a timely notice of appeal on February 8, 2022. J.A. 1174.

The District Court sentenced Hector Tapia Hernandez-Avila to eight months of imprisonment, one year of supervised release, and waived the special assessment. J.A. 1209. Written judgment was entered February 2, 2022. J.A. 1209. The Defendant filed a timely notice of appeal on February 15, 2022. J.A. 1216.

- 19 -

The District Court sentenced Martin Malacara-Guerrero to 24 months of imprisonment, consecutive to his state sentence, one year of supervised release, and a $100 special assessment. J.A. 1246. Written judgment was entered February 17, 2022. J.A. 1246. The Defendant filed a timely notice of appeal on February 18, 2022. J.A. 1253.

## SUMMARY OF THE ARGUMENT

The Defendants contend that, under *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252 (1977), 8 U.S.C. § 1326 violates the Equal Protection Clause of the Fifth Amendment to the United States Constitution based on the discriminatory intent of the law and its disparate impact on Mexican and other Latinx immigrants. The original criminalization of unlawful reentry after deportation in the Undesirable Aliens Act of 1929 took place when American immigration law and policy were greatly influenced by the overt racism of eugenics and a misguided desire to maintain the "racial purity" of the largely Northern and Western European white population of the United States. The 1929 statute was motivated by discriminatory intent against Mexican and other Latinx immigrants, with the dual racist purposes of ensuring a steady supply of racially identifiable, low wage, easily exploited manual labor while preventing those same people from settling in the United States.

The McCarran-Walter Act of 1952 recodified the original 1929 statute as 8 U.S.C. § 1326 without any significant substantive change other than adding a "found in" provision that made it easier to establish

venue and thus easier to prosecute unlawful reentry after deportation. The same Congress had, only months before, passed the so-called "Wetback Bill," and its consideration and debate of McCarran-Walter was likewise littered with racial slurs. The 1952 Congress made no attempt to mitigate the disparate impact on Mexican and other Latinx immigrants, or to even address, much less repudiate, the criminal reentry statute's overtly racist origins.

Subsequent amendments to Section 1326 have increased the penalties for certain violations without ever reassessing, much less changing, the substance of the statute first enacted in 1929. Congress has never grappled with, much less repudiated, the overt racial animus and discriminatory intent that motivated and still infects the criminalization of unlawful reentry after deportation.

The Defendants presented unrebutted evidence from recognized experts regarding the discriminatory intent and disparate impact of Section 1326, corroborated by extensive contemporaneous Congressional records. The Defendants more than met their burden under *Arlington Heights* and the Government, which offered no evidence, completely failed to meet its burden to prove that the statute would have been

- 22 -

enacted absent the discriminatory intent.

## ARGUMENT

**Under *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252 (1977), 8 U.S.C. § 1326 violates the Equal Protection Clause of the Fifth Amendment to the United States Constitution based on the discriminatory intent of the law and its disparate impact on Mexican and other Latinx immigrants.**

## I.     Standard of Review

This Court "review[s] de novo a challenge to the constitutionality of a federal statute." *United States v. Gibert*, 677 F.3d 613, 618 (4th Cir. 2012) (citing *United States v. Buculei,* 262 F.3d 322, 327 (4th Cir. 2001)).

## II.    Argument

Under *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252 (1977), 8 U.S.C. § 1326 violates the Equal Protection Clause of the Fifth Amendment to the United States Constitution based on the discriminatory intent of the law and its disparate impact on Mexican and other Latinx immigrants.

A law can violate equal protection in three ways. First, a law can discriminate on its face. *See*, *e.g.*, *Loving v. Virginia*, 388 U.S. 1 (1967). Second, authorities can apply a facially neutral law in a discriminatory way. *See*, *e.g.*, *Yick Wo v. Hopkins*, 118 U.S. 356 (1886). Third, a legislature can enact a facially neutral law with discriminatory purpose,

- 24 -

which disparately impacts a disfavored group. *Arlington Heights*, 429 U.S. at 265–68. Under *Arlington Heights*, once the challenger shows that discriminatory purpose was a "motivating factor," the burden shifts to the law's defender to show that "the same decision would have resulted even had the impermissible purpose not been considered." *Arlington Heights*, 429 U.S. at 270 n.21. *See also Hunter v. Underwood*, 471 U.S. 222, 228 (1985) (if racial discrimination was a motivating factor, "the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor."). If the Government cannot show the legislature would have enacted the offending law in the "absence of the racially discriminatory motivation," the law violates the Fifth Amendment and must be invalidated. *Id*. at 225.

The Defendants challenged 8 U.S.C. § 1326 under *Arlington Heights*, and the District Court responded, "I'm kind of willing to give you 1929 in terms of some underlying racist motivations being one of the factors there; but, you know, when you get much past that, I think it's a much dicier proposition." J.A. 1042. Given the robust and entirely unrebutted evidence marshalled by the Defendants, the District Court's concession is sound. However, the District Court denied the Defendants'

- 25 -

motion to dismiss on the ground that it did not believe "the Act, … *now continues* to be motivated by racial animus. I don't think I can find that. I do not find that. And, you know, whether it was or wasn't in 1929 -- you know, yeah, it probably was a motivating factor of many folks in Congress, but that -- that doesn't seem to be the end of the inquiry to me." J.A. 1043 (emphasis added).

Based on the same historical record, Chief Judge Du of the District of Nevada applied *Arlington Heights* and found that 8 U.S.C. § 1326 violated the Fifth Amendment's equal protection clause. *United States v. Carrillo-Lopez*, 555 F. Supp. 3d 996 (D. Nev. 2021). Rejecting the Government's argument that "Congress' plenary power over immigration subjects immigration laws such as Section 1326 to a highly deferential standard of review," Chief Judge Du ruled that "greater protections under the Fifth Amendment necessarily apply when the government seeks to 'punish[ ] by deprivation of liberty and property.'" *Id.* at 1001 (quoting *Wong Wing v. United States*, 163 U.S. 228, 237, 16 S.Ct. 977, 41 L.Ed. 140 (1896)). Chief Judge Du found "that Section 1326 does indeed disparately impact Mexican and Latinx individuals," and that the historical evidence "was sufficient for Carrillo-Lopez to meet his burden

that discriminatory intent was a motivating factor of both the 1929 and 1952 enactments." *Id.* at 1005. Chief Judge Du found that "under Arlington Heights, the burden shifts to the government to prove that the statute would have passed even if the impermissible purpose had not been considered," and that the "government fail[ed] to provide sufficient evidence to meet its burden." *Id.*

In addition to Chief Judge Du in *Carrillo-Lopez*, and the District Court here, other courts have also concluded that *Arlington Heights* applies, and that discriminatory intent was a motivating factor when Congress first criminalized unlawful reentry in 1929.

> The Court has little trouble concluding that the Fifth Amendment applies to § 1326, and that if this law were enacted with a racially discriminatory motive, it would be subject to heightened scrutiny. This approach accords with that of several other district courts that have considered this same challenge to § 1326. *See United States v. Munoz-De La O*, 2022 WL 508892 (E.D. Wash. 2022) (considering challenge to § 1326 under *Arlington Heights*, but denying motion to dismiss indictment); *United States v. Hernandez-Lopez*, —— F. Supp. 3d ——, 2022 WL 313774 (S.D. Tex. 2022) (applying *Arlington Heights* without analyzing whether plenary power doctrine dictates rational basis review).
>
> Many district courts that have considered the issue have acknowledged the ugly history behind the 1929 law. *See United States v. Hernandez-Lopez*, 2022 WL 313774 * 2

(gathering cases). Suffice it to say that the history of the 1929 enactment reflects a shameful chapter in America's past, one in which Congress considered "The Eugenical Aspects of Deportation"[10] and in which members of Congress decried that Mexicans were "poisoning the American citizen ... from a moral standpoint," and referred to migrants as "Mexican peons" whose blood was mixed with "low-grade Indians." Racism "permeated the official congressional debate," *Machic-Xiap*, 552 F. Supp. 3d. at 1061, and the Court acknowledges that other district courts have had little trouble ascribing discriminatory intent to Congress with respect to the 1929 UAA. *See Hernandez-Lopez*, 2022 WL 313774 *2 (gathering cases and observing that "[a]ll have acknowledged the racial animus behind the 1929 law.").

*United States v. Calvillo-Diaz*, No. 2022 WL 1607525, at *4 (N.D. Ill. May 20, 2022) (footnote omitted). Nevertheless, it does not appear that any other district court has reached the same result as *Carrillo-Lopez* and granted a motion to dismiss. *See, e.g., United States v. Barrera-Vasquez*, ___ F. Supp. 3d ___, 2022 WL 3006773 (E. D. Va. July 28, 2022); *United States v. Calvillo-Diaz*, 2022 WL 1607525 (N. D. Ill. May 20, 2022); *United States v. Crespo-Castelan*, 2022 WL 2237574 (S.D.N.Y. June 22, 2022); *United States v. Hernandez-Lopez*, 583 F. Supp. 3d 815 (S. D. Texas 2022); *United States v. Machic-Xiap*, 552 F. Supp. 3d 1055 (D. Or. 2021); *United States v. Maldonado-Guzman*, 2022 WL 2704036 (S.D.N.Y. July 12, 2022); *United States v. Munoz-De La O*, 586 F. Supp 3d 1032 (E.

- 28 -

D. Wash. 2022); *United States v. Novondo-Ceballos*, 554 F. Supp. 3d 1114 (D. N. Mex. 2021); *United States v. Paredes-Medina*, 2022 WL 7683738 (D. Nev. Oct. 13, 2022); *United States v. Ponce Calvan*, 2022 WL 484990 (S. D. Cal. Feb. 16, 2022); *United States v. Ramirez-Aleman*, 2022 WL 1271139 (S. D. Cal. Apr. 27, 2022); *United States v. Rodriguez-Arevalo*, ___ F. Supp. 3d ___, 2022 WL 1542151 (M. D. Pa. May 16, 2022); *United States v. Sanchez-Felix*, 2021 WL 6125407 (D. Col. Dec. 28, 2021); *United States v. Santos-Reynoso*, 2022 WL 2274470 (S.D.N.Y. June 23, 2022); *United States v. Vera*, 2022 WL 3716503 (D. N. H. Aug. 29, 2022); *United States v. Viveros-Chavez*, 2022 WL 2116598 (N. D. Il. June 13, 2022); *United States v. Wence*, 2021 WL 2463567 (D. Virgin Islands June 16, 2021). For many, like the District Court here, the key was whether subsequent Congressional recodification and amendment of Section 1326 sufficiently purged the unlawful taint of the original discriminatory intent. The Defendants contend they did not.

The Defendants recognize that, three days ago, a divided panel of the Fifth Circuit rejected an equal protection challenge to the constitutionality of 8 U.S.C § 1326. *United States v. Barcenas-Rumualdo*, ___ F.4th ___, 2022 WL 17072285 (5th Cir. Nov. 18, 2022). Relying on

- 29 -

Fifth Circuit precedent, it did so without considering the overwhelming evidence of the role racial animus played in the enactment of the original 1929 statute – racial animus Congress has neither grappled with nor rejected. 2022 WL 17072285, * 4 (citing *Harness v. Watson*, 47 F.4th 296 (5th Cir. 2020). However, *Harness* itself was the decision of a deeply divided en banc court that relied on state law to conclude "that the current version of Section 241 [of the Mississippi constitution] *superseded* the previous provisions and removed the discriminatory taint associated with the provision adopted in 1890." 47 F.4th at 311 (emphasis added). This Court is not bound by *Barcenas-Rumualdo,* nor is it constrained by the Fifth Circuit's view of what evidence to consider.

Arguably, the absence of any repudiation of the racial animus that led to the original criminalization of reentry in 1929 alone suffices to satisfy the Defendants' burden of demonstrating the 1952 recodification was still motivated by discriminatory intent. *Carrillo-Lopez*, 555 F. Supp. 3d at 1010 ("While the Court might be persuaded that the 1952 Congress' silence alone is evidence of a failure to repudiate a racially discriminatory taint, the Court need not decide that issue."). Likewise, this Court "need not decide that issue," because there is substantial and unrebutted

evidence that the 1952 recodification was still motivated by discriminatory intent. *Id.*

The 1952 Congress began with a simple proposal to recodify the 1929 criminal reentry statute. "The provisions relating to reentry after deportation should be carried forward in one section and apply to any alien deported for any reason and provide for the same penalty." J.A. 0109 (Report: The Immigration and Naturalization Systems of the United States, Senate Committee on the Judiciary, S. Rep. No. 1515, 81st Cong., 2d Sess. (1950)). In the end, the only substantive change in the criminal reentry provision itself, adding "found in" as suggested by Deputy Attorney General Ford, was done for the explicit purpose of making illegal reentry easier to prosecute. J.A. 0931.

Even in the absence of continued racial animus, that simple recodification alone would not purge the criminal reentry statute of the discriminatory purpose behind its original enactment. *United States v. Ryder*, 110 U.S. 729 (1884) ("It will not be inferred that the legislature, in revising and consolidating the laws, intended to change their policy, unless such intention be clearly expressed."); *Keene Corp. v. United States*, 508 U.S. 200, 209 (1993) ("[W]e do not presume that the revision

- 31 -

worked a change in the underlying substantive law 'unless an intent to make such [a] chang[e] is clearly expressed.'") (quoting *Fourco Glass Co. v. Transmirra Prods. Corp.*, 353 U.S. 222, 227 (1957)); *Anderson v. Pac. Coast S.S. Co.*, 225 U.S. 187, 198-99 (1912) ("[I]t will not be inferred that Congress, in revising and consolidating the laws, intended to change their effect unless such intention is clearly expressed."). There was no such clear expression of Congressional intent in 1952. Rather, as Dr. Gonzalez O'Brien testified, "There was no substantial debate around -- or no debate really around 1326 under the 1952 McCarran-Walter Act. After reading -- I've read through the *Congressional Record*. I have not found any instances that specifically referenced or in any way, shape, or form debate 1326 in the McCarran -- in the debate around the McCarran-Walter Act." J.A. 0933.

Not only did the 1952 Congress demonstrate no intention, much less an express intention, to repudiate the statute's racist origins, it made no effort to mitigate the disparate impact of the statute it was simply recodifying and making easier to enforce, despite 23 years of disparate impact evidence.

With stunning precision, the criminalization of unlawful

> entry caged thousands of Mexico's proverbial birds of passage. Within one year of enforcement, U.S. attorneys prosecuted 7,001 cases of unlawful entry. By 1939, they had prosecuted more than 44,000 cases.
>
> In no year did the U.S. attorneys' conviction rate fall below 93 percent of all immigration cases. Taking custody of individuals convicted on federal immigration charges, the U.S. Bureau of Prisons reported that Mexicans never comprised less than 84.6 percent of all imprisoned immigrants. Some years, Mexicans comprised 99 percent of immigration offenders. Therefore, by the end of the 1930s, tens of thousands of Mexicans had been arrested, charged, prosecuted, and imprisoned for unlawfully entering the United States. With 71 percent of all Mexican federal prisoners charged with immigration crimes, no other federal legislation—not prohibition, not drug laws, and neither laws against prostitution nor the Mann act—sent more Mexicans to federal prison during those years.
>
> Clearly, the archival record marks the criminalization of unauthorized entry as a racially motivated act that quickly delivered racially disparate outcomes.

J.A. 0469-0470 (Declaration of Professor Hernandez at 7-8). "Congress' silence about the prior racist iterations of this bill coupled with its decision to expand the grounds for deportation and carceral punishment, *despite its knowledge of the disparate impact of this provision on Mexican and Latinx people*, is some evidence that racial animus was a motivating factor." *Carrillo-Lopez*, 555 F. Supp. 3d at 1016-17 (emphasis added).

- 33 -

Likewise, this Court has recognized, "[d]iscriminatory purpose 'may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another." *North Carolina State Conf. of NAACP v. McCrory*, 831 F.3d 204, 220 (4th Cir. 2016).

Moreover, while the 1952 Congress made no effort to repudiate the racist origins, or mitigate the disparate impact, of the statute it was simply recodifying and making easier to enforce, it also made no effort to insulate that work from the racist atmosphere of the time.

> The Court further considers the passage of the so-called "Wetback Bill" as evidence of historical background. The bill's passage is particularly probative because it was "passed by the same congress during the same time frame and with the same express aim as illegal reentry ..." ... Senate Bill 1851, nicknamed the "Wetback Bill," was passed March 20, 1952, just a few months before the INA. *See* United Statutes at Large, 82 Cong. ch. 108, 66 Stat. 26 (March 20, 1952). The bill's stated aim was to "assist in preventing aliens from entering or remaining in the United States illegally." *Id.* Yet, as Carrillo-Lopez argues, the bill was reflective of Congress' racially discriminatory motivations, not only because of the nickname of the bill but also by the way it sought to achieve its stated aim.
>
> First, the Wetback Bill evidences discriminatory motive simply in its use of the racial epithet "wetback." As Professor Gonzalez O'Brien testified: "In 1952, prior to the passage of the McCarran-Walter Act, you have a Bill that is introduced

- 34 -

and passed on March 20th that is nicknamed the Wetback Bill. And this is a piece of anti-harboring legislature where, throughout the debate, Mexican undocumented entrants are regularly referenced as wetbacks. And Senator McFarland [of Arizona], during the debate over the Act of March 20th, 1952, notes that Senate Bill 1851, a Bill known as the Wetback Bill, was going to be debated. Initially, this legislation was aimed strictly at Mexicans."

Aside from the use of derogatory language, the incongruities between the stated intent of the bill and the actual language of the bill demonstrate the Congress' racist motives and intent. While the stated aim of the bill was to prevent "aliens from entering or remaining in the United States illegally", … it actually "illustrates the intent of congress to preserve the influx of cheap and exploitable labor, while simultaneously marginalizing those workers and excluding them from full participation in American life." … By failing to punish employers who hired illegal immigrants and instead only punishing the laborers themselves, the "1952 and 1929 congresses were both balancing the hunger of the agricultural industry for exploitable labor and the desire to keep America's identity white."

*Carrillo-Lopez*, 555 F. Supp. 3d at 1015 (record citations omitted). As shown by the evidence the Defendants in this case presented, that same racist atmosphere, and casual use of the derogatory, racist term "wetback," also permeated debate on the McCarran-Walter Act. Senators Humphrey, McCarran, and Morse all made use of the term, as did Congressman Walter. J.A. 0134, J.A. 0143, J.A. 0164, J.A. 0245, J.A. 0247, J.A. 0248, J.A. 0249, J.A. 0399. Even when speaking in opposition

to Senator McCarren's suggestion that the new legislation include a provision that would eliminate the requirement that a person act "willfully and knowingly" in order to violate the recently enacted alien harboring provision of the "Wetback Bill," Senator Humphrey used the term repeatedly: "Senators are aware of my own deep interest in the *wetback* provisions of our immigration laws. We debated the *wetback* problem day in and day our earlier in the session. Some time ago I joined the distinguished Senator from Illinois in an effort to tighten the *wetback* provisions." J.A. 0247 (emphasis added). "[W]hile the use of racial slurs, epithets, or other derogatory language does not alone prove discriminatory intent, it is evidence that official action may be motivated by such an unlawful purpose." *La Union del Pueblo Entero v. Ross*, 353 F. Supp. 3d 381, 395 (D. Md. 2018).

The Government argued, and more importantly the District Court accepted the notion, that Congress' minor changes to Section 1326 over the years erase the earlier discrimination.

> So it's pretty tough for me to -- to say that when I look at the entire historical context that the Act, you know, before me now continues to be motivated by racial animus. I don't think I can find that. I do not find that. And, you know,

- 36 -

whether it was or wasn't in 1929 -- you know, yeah, it probably was a motivating factor of many folks in Congress, but that -- that doesn't seem to be the end of the inquiry to me.
. . .

If it -- even if *Arlington Heights* applies and even if one assumes racial animus in 1929, *I'm not satisfied that it continues -- that it continued into 1952 and beyond. The evidence past 1929 seems to indicate to me that the racial animus -- I don't know that it dissolved or completely went away, but other factors overcame it, and there's been plenty of evidence about that in terms of economic factors, the labor market factors, national security factors, et cetera.* So I'm going to deny the defendants' motion, subject, obviously, to reconsideration if the Fourth Circuit tells me otherwise before -- before sentencing.

J.A. 1041-1044. However, as the Supreme Court recognized more than a century ago in *Bear Lake & River Waterworks & Irrigation. Co. v. Garland*, 164 U.S. 1 (1896), even a statutory repeal and recodification has no impact if the substantive provisions remain the same:

Upon comparing the two acts of 1888 and 1890 together, it is seen that they both legislate upon the same subject, and in many cases the provisions of the two statutes are similar, and almost identical. Although there is a formal repeal of the old by the new statute, still there never has been a moment of time since the passage of the act of 1888 when these similar provisions have not been in force.

Notwithstanding, therefore, this formal repeal, it is, as we think, entirely correct to say that the new act should be construed as a continuation of the old with the modification contained in the new act.

- 37 -

164 U.S. at 11-12. Ninety years later, in *Oneida County v. Oneida Indian Nation of New York State*, 470 U.S. 226, 245-46 & n.18 (1985), the Supreme Court articulated the same standard, citing the same cases, when interpreting the federal Nonintercourse Act. The rule is not that any reenactment or repeal changes the meaning or legislative intent of a prior law. The nature of any changes to the text are key. Where, as here, the law continues with only minor changes that make the original 1929 criminalization of unlawful reentry easier to enforce, or increase the penalties for violations, there can be no presumption that the legislature's intent was abrogated. The District Court's conclusion to the contrary cannot be squared with the previously discussed Supreme Court decisions in *Ryder*, *Keene, Fourco Glass or Anderson,* nor can it be reconciled with *Bear Lake* or *Oneida County*.

Based on the same historical record presented to the District Court in this case, Chief Judge Du concluded:

> The totality of evidence shows that the same factors motivating the passage of Section 1326 in 1929 were present in 1952. Not only did Congress fail to repudiate the racial animus clearly present in 1929, but it expanded the government's power to enforce unlawful reentry, despite President Truman's call to reimagine immigration laws. The

> 1952 Congress incorporated the advice of supporters of the bill who used racial epithets in official documents, while contemporaneously passing another bill targeting "wetbacks." Although it is "not easy" to prove that racism motivated the passage of a particular statute, the Court reasons that it cannot be impossible, or *Arlington Heights* would stand for nothing.

*Carrillo-Lopez,* 555 F. Supp. 3d at 1017. That court likewise rejected the Government's attempts to salvage Section 1326 with alternative justifications, as well as its argument "that it met its burden under the second prong of *Arlington Heights*" based on subsequent amendments to the statute. *Id.* at 1025. As Chief Judge Du noted, "Section 1326's reenactment and subsequent amendments *never* substantively altered the original provision, [and] do not reflect any change of Congressional intent policy or reasoning." *Id.* at 1026 (emphasis added). Likewise, the court noted, "there has been no attempt at any point to grapple with the racist history of Section 1326 or remove its influence on the legislation. *Id.* This Court should, on de novo review, reach the same conclusions and result as *Carrillo-Lopez.* The Defendants more than met their burden under *Arlington Heights* and the Government, which offered no evidence, completely failed to meet its burden to prove that the statute would have been enacted absent the discriminatory intent.

**CONCLUSION**

Under *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252 (1977), 8 U.S.C. § 1326 violates the Equal Protection Clause of the Fifth Amendment to the United States Constitution based on the discriminatory intent of the law and its disparate impact on Mexican and other Latinx immigrants. Accordingly, this Court should vacate the judgement of the District Court in each Defendant's case and order the dismissal of the indictments against them.

Respectfully submitted, this the 22nd day of November 2022.

LOUIS C. ALLEN
Federal Public Defender

/s/ Eric D. Placke
ERIC D. PLACKE
First Assistant Federal Public Defender
AR State Bar. No. 86207
NC State Bar No. 20671
301 N. Elm Street, Suite 410
Greensboro, NC 27401
(336) 333-5455
Eric_Placke@fd.org

/s/ Mireille P. Clough
MIREILLE P. CLOUGH
Assistant Federal Public Defender
NC State Bar No. 28473
301 N. Elm Street, Suite 410
Greensboro, NC 27401
(336) 333-5455
Mireille_P_Clough@fd.org

- 41 -

## REQUEST FOR ORAL ARGUMENT

The constitutionality of 8 U.S.C. § 1326 under *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252 (1977), which has not yet been addressed by this Court, is an issue of unusual importance with potential widespread impact. Oral argument will aid this Court in its decisional process and is particularly appropriate in light of the issue presented. Accordingly, the Defendants request that this matter be set for oral argument.

## UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. _____      Caption: _____

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT
Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

> **Type-Volume Limit for Briefs if Produced Using a Computer:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 13,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 15,300 words or 1,500 lines. A Reply or Amicus Brief may not exceed 6,500 words or 650 lines. Amicus Brief in support of an Opening/Response Brief may not exceed 7,650 words. Amicus Brief filed during consideration of petition for rehearing may not exceed 2,600 words. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include headings, footnotes, and quotes in the count. Line count is used only with monospaced type. See Fed. R. App. P. 28.1(e), 29(a)(5), 32(a)(7)(B) & 32(f).

> **Type-Volume Limit for Other Documents if Produced Using a Computer:** Petition for permission to appeal and a motion or response thereto may not exceed 5,200 words. Reply to a motion may not exceed 2,600 words. Petition for writ of mandamus or prohibition or other extraordinary writ may not exceed 7,800 words. Petition for rehearing or rehearing en banc may not exceed 3,900 words. Fed. R. App. P. 5(c)(1), 21(d), 27(d)(2), 35(b)(2) & 40(b)(1).

> **Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch). Fed. R. App. P. 32(a)(5), 32(a)(6).

This brief or other document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[ ]   this brief or other document contains _____ [*state number of*] words

[ ]   this brief uses monospaced type and contains _____ [*state number of*] lines

This brief or other document complies with the typeface and type style requirements because:

[ ]   this brief or other document has been prepared in a proportionally spaced typeface using _____ [*identify word processing program*] in _____ [*identify font size and type style*]; **or**

[ ]   this brief or other document has been prepared in a monospaced typeface using _____ [*identify word processing program*] in _____ [*identify font size and type style*].

(s)_____

Party Name_____

Dated:_____

04/12/2020   SCC

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT
No. 22-4072 (L)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| Appellee | : | |
| v. | : | |
| JORGE SANCHEZ-GARCIA, | : | No. 22-4072(L) |
| VINCENTE BANALES RODRIGUEZ, | : | No. 22-4075 |
| NICOLAS MORALES-GUTIERREZ, | : | No. 22-4077 |
| JESUS BENITEZ PINEDA, | : | No. 22-4078 |
| HECTOR TAPIA HERNANDEZ-AVILA, | : | No. 22-4100 |
| MARTIN MALACARA-GUERRERO, | : | No. 22-4107 |
| Appellants | : | |

**CERTIFICATE OF SERVICE OF APPELLANTS' BRIEF**

I hereby certify that, on this date, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF user:

Margaret M. Reece, AUSA

I further certify that I served the following non-CM/EDF participants by United States Mail:

Jorge Sanchez Garcia
(Current Address Unknown)

Vincente Banales Rodriguez, #30384-408
FCI Edgefield
P. O. Box 725
Edgefield, SC 29824


Nicolas Morales-Gutierrez, #1646671
Albemarle Correctional Institution
P. O. Box 460
Badin, NC 28009


Jesus Benitez Pineda, #43247-279
(Current Address Unknown)

Hector Tapia Hernandez-Avila
(Current Address Unknown)

Martin Malacara-Guerrero, #1680379
Albemarle Correctional Institution
P. O. Box 460
Badin, NC 28009


Respectfully submitted, this the 22nd day of November 2022.

LOUIS C. ALLEN
Federal Public Defender

/s/ Eric D. Placke
ERIC D. PLACKE
First Assistant Federal Public Defender